IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| GREG COLLIER, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 104-057 |
| | * | |
| THE BOARD OF TAX ASSESSORS OF | * | |
| AUGUSTA-RICHMOND COUNTY, | * | |
| through its Chair, Burt | * | |
| Thomas, in his individual and | * | |
| official capacities for the | * | |
| members of the Board; et al., | * | |
| | * | |
| Defendants. | * | |

### O R D E R

Plaintiff filed the captioned case alleging that Defendants violated his constitutional rights when they fired him for complaining about his employers' mismanagement. Presently before the Court is Defendants' motion for summary judgment. (Doc. No. 30.) For the reasons below, Defendants' motion is **GRANTED**.

### I. Background

From April 30, 2001 until he was terminated on April 5, 2002, Plaintiff worked for Defendant Augusta-Richmond County ("Augusta") in the Office of the Tax Assessor. (Pl.'s Dep. at 41, 44.) In his complaint, brought pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff asserts: (1) he was fired in violation of the First Amendment and unspecified "provisions

of Georgia law that protect whistleblowers" after he spoke to his supervisors about "the fact that he had not timely been scheduled for certification" and his concerns regarding "fraud, waste, or abuse of governmental authority" (Compl. at 7-8); (2) the use of "probationary employee status upon Plaintiff" violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the First Amendment (id. at 8); (3) Defendants' failure to "timely schedule necessary certification tests" for Plaintiff violated the Due Process Clause (id. at 8-9); and (4) Plaintiff was terminated in retaliation for bringing his complaints to the Human Resources Department for Augusta (id. at 9).

According to Plaintiff, each Defendant played some role in these alleged wrongs. Defendant Augusta is Plaintiff's ultimate employer. Defendant Sonny Reece ("Reece") was the Chief Appraiser in the Office of the Tax Assessor during Plaintiff's employment with Defendant, with the authority to hire and fire Plaintiff. (Reece Aff. at 4.) Defendant Melanie Ogelsby ("Ogelsby") was the Deputy Chief Appraiser for Personal Property and Land Records, and Plaintiff's immediate supervisor for much of his employment. (Ogelsby Dep. at 4, 101.) Defendant Brenda Byrd-Pelaez ("Pelaez") was the Director of Human Resources for Augusta (Pelaez Dep. at 3), while Defendant Moses McCauley ("McCauley") was an employment manager for Augusta (McCauley Dep. at 3). Plaintiff has also

sued the Augusta Board of Tax Assessors ("the Board"), the entity which oversees the Tax Assessor's Office. (Defs.' Mem. in Supp. of Summ. J. at 1.)

Plaintiff was hired to work as a property appraiser for mobile homes. His duties included: (1) determining whether taxpayers were delinquent in paying property taxes and initiating the prosecution of cases against allegedly delinquent taxpayers (Compl. at 2; Pl.'s Dep. at 52-54), (2) computerized data entry (Pl.'s Dep. at 45), (3) creating and keeping accurate tax records (Compl. at 6), (4) inspecting mobile homes to see whether they had proper tax decals (Pl.'s Dep. at 45), (5) appearing in court on behalf of Defendant Augusta (id. at 50, 100, 123), and (6) answering taxpayers' questions (id. at 321).

During orientation, Plaintiff was provided with Augusta's one-year probationary policy, informing him that he could be fired at any time, for any reason, or for no reason at all. (Defs.' Statement of Undisputed Material Facts at 3; Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts at 3.) This one-year probationary period applied to all new Augusta employees. (Pl.'s Dep. at 86.) Plaintiff understood throughout his employment that he was an at-will employee. (Id. at 68, 70, 86.)

That said, as a requisite to continued employment, Plaintiff was required to obtain certification for "Appraiser

3

II" status during this probationary period. (Defs.' Statement of Material Facts at 4; Pl.'s Resp. to Pl.'s Statement of Material Facts at 16.) However, other employees were allowed to obtain their certifications late, or to allow their certifications to lapse, without being terminated. (See, e.g., Dickerson Dep. at 8.) The parties dispute whether Plaintiff timely qualified for "Appraiser II" certification. (See Defs.' Statement of Material Facts at 4; Pl.'s Resp. to Defs.' Statement of Material Facts at 16.) Regardless, no one contends that Plaintiff was fired for failing to obtain certification.

Soon after his hiring, Plaintiff became dissatisfied with his job. Taking advantage of Reece's "open door" policy, Plaintiff complained to Reece that he wanted to appraise homes rather than mobile homes and that he felt "hooked into [his] job." (See Pl.'s Dep. at 136-37; Pl.'s Resp. to Defs.' Statement of Undisputed Facts at 20-21.) In fact, after being on the job for a few months, Plaintiff began applying for other employment opportunities with Augusta. (Pl.'s Dep. at 90.) He largely abandoned those efforts when he learned that his probationary period would begin anew if he transferred. (Id. at 85-86, 89-90, 257.)

Meanwhile, Plaintiff and Reece got into several disagreements, some of which were heated. (Defs.' Statement of Undisputed Facts at 8; Pl.'s Resp. to Defs.' Statement of

4

Undisputed Facts at 20.) According to Reece, Plaintiff complained that an entire section of the office should be devoted to mobile homes; Plaintiff also expressed his belief that he was "management material." (Reece Aff. ¶ 8; see also Pittman Dep. at 42; Pl.'s Resp. to Defs.' Statement of Undisputed Facts at 15, 20.) Plaintiff also complained to Reece that his training was inadequate and that the office was inefficient. (See Pl.'s Decl. ¶¶ 372-73, 395.) Reece agreed that the office needed improvement, but also tried to explain that changes would not happen "overnight." (Reece Dep. at 20.) When Reece suggested that Plaintiff develop a manual to help organize mobile home appraisal, Plaintiff refused. (Id. at 30-31, 45-46.) In Reece's view, Plaintiff demonstrated that he was not a "team player" and that he would not fit in well at the office. (Id. at 29-31.)

During Plaintiff's time in the Tax Assessor's Office, Reece reorganized its internal structure. Plaintiff initially worked in the real estate section of the Tax Assessor's office under Deputy Chief Appraiser Donna Murray ("Murray"), who evaluated Plaintiff's job performance as "average."[1] (Murray Dep. at 12; Pl.'s Dep. at 82.) During November 2001, mobile home appraisal was moved from the real estate section to the personal property section, and Plaintiff was transferred to

---

[1] Perhaps in contrast to her written evaluation, Murray stated during her deposition that Plaintiff "did a very good job" while working under her supervision. (Murray Dep. at 12.)

Ogelsby's supervision. (Pl.'s Dep. at 46.) While under Ogelsby's supervision, Plaintiff and Ogelsby came into frequent conflict.

During his time in Ogelsby's section, much of Plaintiff's work was spent helping to correct and update tax records as the Tax Assessor's Office switched to a new computer program called "Wingap." (Defs.' Statement of Undisputed Facts at 6; Pl.'s Resp. to Defs.' Statement of Undisputed Facts at 18.) At this time, Plaintiff began to notice inaccuracies in Augusta's tax records (Pl.'s Dep. at 60, 62-64, 66) and eventually became convinced that the Tax Assessor's Office was taking people to court who were not actually delinquent in paying their taxes. (Pl.'s Decl. ¶¶ 159-77; Pl.'s Dep. at 170.) According to Plaintiff, it was his "job to make sure the truth became public." (Pl.'s Resp. to Defs.' Statement of Undisputed Facts at 17.)

The handling of two court cases caused Plaintiff the greatest consternation. In the "Douglas" case, Plaintiff expressed concern to Ogelsby that the tax records were inaccurate and that the case "shouldn't have been in court." (Pl.'s Dep. at 126; see also id. at 171.) Ogelsby rejected Plaintiff's concerns and refused to "pull" the case. (Id. at 126.) The Douglas case was resolved on a "guilty plea" and Plaintiff concedes that Ms. Douglas owed taxes, but maintains that inaccuracies in the tax records caused the court to

require an overpayment. (Id. at 182.) Plaintiff helped Ms. Douglas obtain a partial refund. (Id.) Perhaps upset that Plaintiff "had went [sic] around her," Ogelsby sent an email requiring all refund-related issues to be routed through her. (Id. at 183-84.)

In the "Alewine" case, Plaintiff also expressed concerns to Ogelsby regarding inaccurate records. (Id. at 213.) According to Plaintiff, this case was an embarrassment to the Tax Assessor's Office because Ms. Alewine was able to demonstrate that her tax records were outdated; however, Plaintiff concedes that Ms. Alewine did in fact owe taxes and entered a plea of "*nolo contendere*." (Pl.'s Resp. to Defs.' Statement of Undisputed Facts at 25; Pl.'s Dep. at 153-54, 210-14.)

Nevertheless, Plaintiff's objections to the handling of these cases led him to "defy" Ogelsby and to refuse to participate in any other court cases until the alleged problems were fixed. (Pl.'s Dep. at 152, 170, 184, 234-35.) Plaintiff and Ogelsby also had conflicts regarding Plaintiff's certification. Specifically, the two disagreed about when to schedule Plaintiff for needed training courses, which courses Plaintiff should take, and when he should be scheduled to take the "Appraiser II" certification exam. (Pl.'s Dep. at 132-33; Pl.'s Resp. to Def.'s Statement of Undisputed Facts at 25.) During one of their conversations, Plaintiff allegedly told

Ogelsby that he could not give his job "100%" because of the lack of structure, timely training, and organization. (Defs.' Statement of Undisputed Facts at 11; Pl.'s Resp. to Defs.' Statement of Material Facts at 27; Pl.'s Dep. at 238.) According to Ogelsby, Plaintiff once exclaimed in frustration that he would either quit or get fired. (Ogelsby Dep. at 64-65.)

During his employment, Plaintiff was also complaining about his job to officials in the Human Resources Department. In December 2001, Plaintiff complained to Pelaez that the office was disorganized and that tax prosecutions were in disarray. (Pl.'s Dep. at 255.) Unbeknownst to Pelaez, Plaintiff recorded this conversation. (See Defs.' Exs. I & N.)

On March 26, 2002, Plaintiff, Reece, and Ogelsby met to discuss Plaintiff's problems at work. Ogelsby complained about Plaintiff's attitude, and Plaintiff accused her of lying. (Pl.'s Dep. at 185.) Following this incident, Plaintiff spoke with Pelaez and McCauley about his work-related issues. (Id. at 191-94.) Plaintiff again complained about lack of training, "being thrown into court unprepared," and the lack of "structures and procedures" at the office. (Pl.'s Dep. at 146, 192-93.) Subsequent to Plaintiff's complaints to the Human Resources Department, Reece fired Plaintiff without offering an explanation of any kind. (Id.

at 195.)

In fact, Reece decided to fire Plaintiff during a senior staff meeting. Reece, Ogelsby, Murray, and two other staff members, Linda Vrona and Meg Birkenshaw, were present. (Reece Dep. at 47.) At this meeting, Ogelsby outlined her alleged concerns that Plaintiff was unhappy, disruptive, and unproductive. (Ogelsby Dep. at 86.) According to Defendants, progress reports show that Plaintiff's productivity decreased during his employment. (Defs.' Mem. in Supp. of Mot. for Summ J. at 28 (citing Defs.' Ex. I & Pl.'s Dep. at 242).)

Ogelsby was also allegedly concerned that Plaintiff broke the office's unwritten rules of etiquette when he ignored the "chain of command" and brought his concerns directly to Reese without speaking with her first. (Defs.' Statement of Undisputed Facts at 12.) With the exception of Murray (see Murray Dep. at 10), the senior staff agreed with Ogelsby's assessment and voted to terminate Plaintiff. (Reece Dep. at 47.) Choosing to support and trust Ogelsby and his other senior staff, Reece then fired Plaintiff. (Id.)

Also of note, at the time the decision to terminate was made, Reece did not know that Plaintiff was complaining about his job to Human Resources personnel. (See, e.g., Defs.' Statement of Undisputed Facts at 12.) In fact, after deciding to terminate Plaintiff, Reece sought Pelaez's advice in making

9

sure that Plaintiff's firing was conducted according to county policy. (Reece Dep. at 48; Ogelsby Dep. at 80.)

Following his termination, Plaintiff again brought his concerns to McCauley and Peleaz; he also sought out Mr. E. L. Thomas, a member of the Board of Tax Assessors. (Pl.'s Dep. at 14-25, 141, 201.) His complaints having fallen on deaf ears, Plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging race discrimination. Following the issuance of a right-to-sue letter, Plaintiff brought the instant suit. The Court resolves the matter as follows.

## II.  Requirements for Summary Judgment

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). If the *movant* bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party." Four Parcels, 941 F.2d at 1438. On the other hand, if the *non-movant* has the burden of proof at trial, the movant may carry the initial burden in one of two ways--by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (*per curiam*). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If--and only if--the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. Again, how to carry this burden depends on who bears the burden of proof at trial. If the *movant* has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. Anderson, 477 U.S. at 249. If the *non-movant* bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as

12

otherwise provided by Fed. R. Civ. P. 56.

The Clerk has given the non-moving party notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 40.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (*per curiam*), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.

### III. Analysis

**A. First Amendment Claims**

Plaintiff's First Amendment claims fail as a matter of law. To begin, the Court notes Plaintiff's attempt to characterize Augusta's probationary employment policy as an impermissible, overly broad "prior restraint" which chills speech and which Plaintiff challenges "facially" and "as applied." (<u>See</u> Pl.'s Resp. to Defs.' Mot. for Summ. J. at 2.) Plaintiff's logic is not particularly helpful.

Rather, the Supreme Court has provided the analysis applicable to claims like Plaintiff's. "In the particularized context of government employees exercising their First Amendment rights, . . . the appropriate analysis is the balancing test established in <u>Pickering v. Board of Education of Township High School District 205</u>, 391 U.S. 563, 88 S. Ct.

13

1731, 20 L.Ed.2d 811 (1968)." Thaeter v. Palm Beach County Sheriff's Office, 449 F.3d 1342, 1355 (11th Cir. 2006). Under this test, the government employee arguing that an adverse employment decision violated his First Amendment rights must show:

> 1) that the speech can be fairly characterized as relating to a matter of public concern, 2) that [his] interests as a citizen outweigh the interests of the State as an employer, and 3) that the speech played a substantial or motivating role in the government's decision to take an adverse employment action.

Akins v. Fulton County, Ga., 420 F.3d 1293, 1303 (11th Cir. 2005). Once an employee has met this burden, it falls to the employer to show that it would have taken the adverse employment action irrespective of the First Amendment conduct. Id.

Also of note, the Supreme Court has recently clarified the Pickering test by holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S. __, 126 S. Ct. 1951, 1960 (2006). Plaintiff's claims do not survive scrutiny under Pickering and Garcetti.

First, it should be noted that Plaintiff never expressed his views to the public at large, and the speech at issue exclusively concerned the subject matter of his employment.

Although these facts regarding the context of Plaintiff's speech are not dispositive, see Garcetti, 547 U.S. at __, 126 S. Ct. at 1959, they do not weigh in Plaintiff's favor.[2] Here, much of Plaintiff's speech was clearly made as a disgruntled employee, rather than as a private citizen concerned about corruption. Simply put, the Court is not persuaded that Plaintiff's complaints about the internal organization of the Tax Assessor's Office, his training, or the timing of his certification examination presented matters of public concern.

In this regard, Plaintiff has produced scant support for his accusations of corruption, fraud, and deliberate waste. More importantly, those parts of Plaintiff's speech which touched matters of public concern—allegedly improper tax prosecutions and inaccurate tax records--were made during the performance of his official job duties. Indeed, Plaintiff's speech chiefly concerned disagreements between himself and his superiors regarding how he ought to perform his duties. In fact, Plaintiff concedes that his speech was "a result of his public employment." (Pl.'s Br. in Resp. to Defs.' Supplemental Authority at 2.)

"Restricting speech that owes its existence to a public

---

[2] See Kurtz v. Vickrey, 855 F.2d 723, 729 (11th Cir. 1988) (explaining that an employee's "profession of public concern loses force when . . . he [takes] no affirmative steps to remedy, or to inform the public at large about, the problems with which he [is] so gravely concerned"); Nero v. Hosp. Auth. of Wilkes County, 86 F. Supp.2d 1214, 1225 (S.D. Ga. 1998) (Bowen, J.) ("When an employee communicates matters in the 'normal course of his duties' these matters are communicated as an employee and are not protected speech.").

employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." Garcetti, 547 U.S. at __, 126 S. Ct. at 1960. Accordingly, the Court rejects Plaintiff's argument that it was not his "job" to complain about Ogelsby's management, tax record inaccuracies, or problems with tax prosecutions. (Pl.'s Br. in Resp. to Defs.' Supplemental Authority at 2.) The inquiry into whether speech is made pursuant to an employee's official duties is a "practical one." Garcetti 547 U.S. at __, 126 S. Ct. at 1961. Put plainly, the issue is whether Plaintiff's speech was an attempt to bring wrongdoing to light "under circumstances in which he had no obligation or responsibility to do so." Morris v. Crow, 142 F.3d 1379, 1382 (11th Cir. 1998).

Here, Plaintiff defines his official duties too narrowly--and in contradiction to his own prior description of his job. (See, e.g., Pl.'s Resp. to Defs.' Statement of Undisputed Facts at 17.) Any reasonable examination of the record evidence shows that it was Plaintiff's duty to ensure the accuracy of tax records and to initiate cases against delinquent taxpayers. Not only did Plaintiff disagree with Ogelsby and Reece regarding the proper performance of these duties, he flatly refused to perform aspects of his job as instructed by Ogelsby. An employee "[speaking] in [his] capacity as a public employee contributing to the formation

16

and execution of official policy" does not engage in expression protected by the First Amendment. See <u>Mills v. City of Evansville, Ind.</u>, 452 F.3d 646, 648 (7th Cir. 2006) (Easterbrook, J.) (holding that police officer's comments to superiors regarding the implementation of new personnel policy were not protected speech).

That Plaintiff contends that Ogelsby's instructions were erroneous or even unfair is immaterial. In this regard, the instant case bears no meaningful distinction from <u>Garcetti</u>, in which a deputy district attorney raised concerns to his superiors about inaccuracies in an affidavit used to procure a search warrant. 547 U.S. at __, 126 S. Ct. at 1956. Simply put, Plaintiff's disputes with his superiors over the policies and procedures of the Tax Assessor's Office did not constitute protected First Amendment conduct.

It should also be noted that, because Plaintiff interacted with the public during mobile home inspections, court proceedings, and in answering taxpayers' questions, his employers had a strong interest in ensuring that Plaintiff would not undermine their policies. "[T]he power to remove individuals from a government position with or without cause implies that those individuals should be responsive to the policy choices of the authority at whose will they serve." <u>McKinley v. Kaplan</u>, 262 F.3d 1146, 1151 (11th Cir. 2001). In sum, Plaintiff has not shown that he was engaging in protected

17

First Amendment conduct.[3]

## B. Equal Protection & Due Process Claims

Next, the Court addresses Plaintiff's equal protection claims. Here, Plaintiff pleads no additional allegations, but rather argues that his First Amendment claims also evince a violation of the Equal Protection Clause. Thus, the Court rejects Plaintiffs equal protection claims as nothing more than a restatement of his First Amendment arguments. See Watkins v. Bowden, 105 F.3d 1344, 1354-55 (11th Cir. 1997).

That said, considering Plaintiff's argument that Reece's office and the Human Resources Department constituted "fora" in which Plaintiff had a "right" to express his complaints (see Pl.'s Resp. to Defs.' Mot. for Summ. J. at 30), Plaintiff's claims on this score may be best understood as an argument that he was subjected to viewpoint discrimination. It is true that "[w]hen the government selectively excludes speakers from a forum, Equal Protection interests as well as First Amendment interests may be implicated." Cook v. Gwinnett County School Dist., 414 F.3d 1313, 1321 (11th Cir. 2005).

Nevertheless, Plaintiff's argument that Reece's office constituted a "forum" where he could say whatever he wanted

---

[3] The Court should also briefly note that, assuming arguendo that Plaintiff has a viable First Amendment claim, the individual defendants are clearly entitled to qualified immunity. See Chesser v. Sparks 248 F.3d 1117, 1121-24 (11th Cir. 2001) (holding that county commissioner who fired payroll officer for objecting to county policy as violative of the Fair Labor Standards Act was entitled to qualified immunity).

without consequence is unpersuasive. As to his complaints to the Human Resources Department, it is undisputed that Reece was not even aware of Plaintiff's communications with Pelaez and McCauley when he terminated Plaintiff. Consequently, I reject Plaintiff's retaliation claims, whether viewed as arising under the First Amendment or the Equal Protection Clause.

I also conclude that Plaintiff has no viable claim under the Due Process Clause. First, Plaintiff had no substantive due process interest in his employment. "'Because employment rights are state-created rights and are not "fundamental" rights created by the Constitution, they do not enjoy substantive due process protection.'" Silva v. Bieluch 351 F.3d 1045, 1047 (11th Cir. 2003)(quoting McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994)). Second, an at-will employee generally has no property interest in his job; thus, he is not entitled to a hearing or other procedural protections. See, e.g., Ross v. Clayton County, Ga., 173 F.3d 1305, 1308 (11th Cir. 1999). Plaintiff points out no basis upon which to deviate from this general rule. In sum, Plaintiff's due process claims fail as a matter of law.

C.  **State Law Claim**

The remaining claim in this case is Plaintiff's state law

claim for violations of "provisions of Georgia law that protect whistleblowers." Presumably, Plaintiff refers to the Georgia Whistle Blower Statute, O.C.G.A. § 45-1-4. Because jurisdiction over this claim rests solely upon 28 U.S.C. § 1367, the absence of a federal claim places supplemental jurisdiction in doubt. 28 U.S.C. § 1367(c)(3). Accordingly, Plaintiff's state law claim is **DISMISSED WITHOUT PREJUDICE**. Id.; Crosby v. Paulk, 187 F.3d 1339, 1352 (11th Cir. 1999).

### IV.  Conclusion

Upon the foregoing, Defendants' motion for summary judgment (Doc. No. 30) is **GRANTED**.[4] The Clerk is instructed to **ENTER FINAL JUDGMENT** for Defendants and **CLOSE** this case. Costs are assessed against Plaintiff.

**ORDER ENTERED** at Augusta, Georgia, this ___8th___ day of November, 2006.

_____
UNITED STATES DISTRICT JUDGE

---

[4] Defendants' "Motion for Enlargement of Brief" (Doc. No. 29) is **GRANTED**. All other pending motions (Doc. Nos. 28 & 41) are **DENIED** as **MOOT**.